# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | CR423-081 |
| | ) | |
| JAMARIO D. OWENS, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Defendant Jamario D. Owens faces one count of possession of a firearm by a prohibited person under 18 U.S.C. § 922(g)(1). Doc. 1 (Indictment). The firearm was discovered in Owens' possession during an encounter with the Savannah Police Department ("SPD"), and Owens moves to suppress the firearm on Fourth Amendment grounds. *See* doc. 18. The Motion to Suppress is fully briefed, *see* doc. 25, and the Court held a suppression hearing on February 22, 2024, doc. 37 (Minute Entry).

## I.    BACKGROUND

On April 24, 2023, SPD officers responded to an anonymous call about a "loud," possibly armed individual in a green Chevy Tahoe. Doc. 37-2 at 3 (SPD Incident Report by Officer Dominic Lambert). While canvassing the scene, Officer Dominic Lambert noticed a black GMC

1

Yukon parked with the lights on and a man asleep in the driver's seat. *Id.* Lambert alerted the other responding units to a "subject in a vehicle, appears to be sleeping in a GMC." Gov. Ex. C at 1:14-23 (Body-Worn Camera Footage from Officer Dominic Lambert).

Lambert and two other officers approached the GMC Yukon, shining flashlights into the windows. Gov. Ex. C at 2:00-2:24. At the suppression hearing, Lambert testified that he could not see Owens' chest rising and falling, and was therefore concerned that Owens was not breathing. Lambert knocked on the rear driver-side window with his flashlight. *Id.* at 2:23-24. There was no response. *Id.* The officers continued circling the vehicle. *Id.* at 2:25-44. After a brief moment, Lambert knocked on the front driver-side window using his fist. *Id.* at 2:43-47. This time, Owens woke up. He exclaimed and looked around at the officers surrounding the vehicle–one was on the passenger's side, one was in front of the car, and Lambert stood next to the driver-door. *Id.* at 2:48-56. Lambert asked, "You good?" and held up a thumbs up. *Id.* at 2:58-59. Owens did not respond, but did something inside the vehicle that created a rapid clicking sound. *See id.* at 3:00-03. Lambert testified that he believed Owens was struggling with the locks–he could see the

lock on the door moving up and down–and was attempting to open the door to exit the vehicle.  Lambert then opened the driver-door from the outside.  *Id.* at 3:03-05.  After he opened the door, the other two officers moved to join him at the driver's side of the vehicle.  *See id.* at 3:08-16.

Lambert asked Owens again if he was "good," and Owens replied, "Yes, sir."  Gov. Ex. C at 3:05-06.  Lambert asked if Owens was trying to get out of the car.  *Id.* at 3:06-12.  Owens replied, "Nah, I was just sitting in the car."  *Id.*  Owens turned to watch the other two officers come around the front of the vehicle.  *Id.* at 3:11-14.  Lambert assured Owens that Owens was "good" and began to explain why SPD was on the scene. *Id.* at 3:14-3:21.  As Lambert was saying that he knew Owens' car was a black GMC and not a green Chevy Tahoe, Owens voluntarily stood and put his hands up.  *Id.* at 3:21-23.  Lambert reassured Owens that Owens was "good."  *Id.* at 3:23-24.  However, with Owens standing, a gun became clearly visible in the driver's seat.  *Id.* at 3:24; doc. 37-2 at 3 at 4.

Lambert moved Owens away from the vehicle.  Gov. Ex. C at 3:26-31.  He told Owens, "You're good, boss.  I didn't mean to scare you. Nothing inherently wrong happened."  *Id.* at 3:32-35.  He also said that Owens could put his hands down because "this isn't like that."  *Id.* at

3

3:45-49.  Lambert said he saw Owens sleeping in the car and was "trying to make sure everything was good."  *Id.* at 49-52.  Lambert then asked Owens for his license (which Owens did not have) and for his name and date of birth.  *Id.* at 3:57-4:24.  Per Lambert's incident report, at some point during Lambert's conversation with Owens, Officer "Florio took possession of the firearm for safety, and it was found that the serial number had been scratched off the firearm."  Doc. 37-2 at 3.  An officer then came around behind Owens and handcuffed him.  *See id.* (indicating that Owens was handcuffed after officers realized the serial number had been removed from the firearm); Gov. Ex. C at 4:22-45.  The encounter–from the time Owens woke up to the time he was handcuffed–lasted less than two minutes.  *See generally* Gov. Ex. C.

## II.   ANALYSIS

Owens seeks to suppress the firearm on two grounds.  First, he argues that his initial encounter with SPD–prior to Lambert opening the car door–was a *Terry* stop and no reasonable suspicion existed to justify the stop.  Doc. 18 at 3.  Second, he argues that Lambert opening the vehicle door was a warrantless search without probable cause.  *Id.*

A. *Terry* Stop

There are three categories of police-citizen encounters: (1) police-citizen communications involving no coercion or detention, (2) brief seizures or investigative detentions (i.e., *Terry* stops), and (3) full-scale arrests. *See United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989). "The first type of encounter, often referred to as a consensual encounter, does not implicate the Fourth Amendment." *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011). Officers do not need reasonable suspicion to engage in in these consensual encounters.

Owens' encounter with SPD did not implicate the Fourth Amendment; it did not involve "coercion or detention" and not was not a *Terry* stop. *See Hastamorir*, 881 F.2d at 1556. "[A] person is 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave" or terminate the encounter. *See United States v. Mendenhall*, 446 U.S. 544, 553 (1980); *Florida v. Bostick*, 501 U.S. 429, 436 (1991) (holding that where an individual's "freedom of movement [is] restricted by a factor independent of police conduct," the appropriate question is whether a reasonable person would feel free to

5

decline police requests or terminate the encounter). The test is objective and "presupposes an innocent person." *Bostick*, 501 U.S. at 438 (emphasis omitted); *see also Mendenhall*, 446 U.S. at 554-55.

> Factors relevant to this inquiry include, among other things: whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect; and the language and tone of voice of the police.

*United States v. Perez*, 443 F.3d 772, 778 (11th Cir. 2006) (internal quotations omitted). These factors are neither exhaustive nor meant to be applied rigidly. *See Jordan*, 635 F.3d at 1186. In view of all the circumstances surrounding the interaction at issue, a reasonable person in Owens' position would have believed he was free to leave or terminate the encounter.

Owens awoke to see three police officers–one on the passenger side, one in front of the vehicle, and one next to the driver door–shining flashlights into the car windows. *See* Gov. Ex. C at 2:00-2:24. While the officers' positioning may have made it difficult for Owens to pull out of the parking spot or leave on foot, "[a] police officer does not seize an individual merely by approaching a person in a parked car." *Miller v.*

*Harget*, 458 F.3d 1251, 1253, 1257 (holding that no seizure occurred when, among other things, an officer parked his patrol car behind an individual's vehicle and approached the driver's side door, effectively blocking the individual from pulling out of the space or opening the driver's door to leave on foot).  Generally, officers may approach citizens in public places and ask them questions without any level of suspicion. *See Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion); *United States v. Drayton*, 536 U.S. 194, 200-01 (2002); *cf. United States v. De La Rosa*, 922 F.2d 675 (11th Cir. 1991) (holding that an apartment complex parking lot is a "public place" where an officer can approach a citizen and ask them questions, even when the parking lot is behind a security gate). The use of flashlights was not a show of authority that elevated the encounter to a stop because "[a] flashlight would also be used by 'an officer approach[ing] a stranded motorist to offer assistance.'" *United States v. Knights*, 989 F.3d 1281, 1287 (11th Cir. 2021) (quoting *Miller*, 458 F.3d at 1258).  Indeed, very little occurred in the twenty seconds between when Owens woke up and Lambert opened the driver door that would indicate that officers were there to do anything other than offer assistance; the only direct interaction Owens had with the officers before

Lambert opened the door was Lambert calmly asking Owens if he was "good" and holding out a thumbs up sign. Gov. Ex. C at 2:58-59. None of the officers brandished their weapons, raised their voices, issued orders, activated their roof lights, touched Owens, or made any other show of force. *Cf. Miller*, 458 F.3d at 1257 (suggesting that drawing a gun, issuing orders, or activating roof lights would appear coercive to a reasonable person).

On the whole, the *Perez* factors weigh in favor of finding that a reasonable, innocent person would have felt free to end the encounter.[1] Under the totality of the circumstances, Owens was not "'seized' within the meaning of the Fourth Amendment. *See Mendenhall*, 446 U.S. at 553. The Court should find that this was not a *Terry* stop. *See Perez*, 443 F.3d at 778. To the extent he argues that the firearm should be

---

[1] Though Owens only alleges that a *Terry* stop occurred between the officers' initial approach and Lambert opening the door, *see* doc. 18 at 3, the Court observes that the officers' behavior after Lambert opened the door was similarly inoffensive. For example, the officers gathered off to the side after Lambert opened the car door, leaving room for Owens to pull out of the parking space. *See* Gov. Ex. C at 3:08-16. Their weapons remained holstered. *See generally id.* And throughout the entire encounter, Lambert spoke to Owens calmly and reassured Owens that Owens was "good," that the police were not there because of anything he had done or been accused of doing, that they were simply checking on his wellbeing, and that he did not need to keep his hands up because the encounter was not "like that." *Id.* at 3:45-49.

suppressed because it was seized pursuant to an unlawful *Terry* stop, Owens' Motion to Suppress should be **DENIED**.  Doc. 18, in part.

      B. <u>Warrantless Search</u>

In its Response to the Motion to Suppress, the Government did not dispute Owens' contention that opening the car door constituted a warrantless search.  *See* doc. 25 at 8-9 (assuming *arguendo* that opening the door constituted a warrantless search).  At the suppression hearing, the Government went a step further and affirmatively conceded that when Lambert opened Owens' door,[2] he conducted a warrantless search. After concluding her argument regarding the potential *Terry* stop, counsel for the United States said: "That would lead us to the second question, and that's whether Officer Lambert's actions of opening that car door constituted a search, a search and seizure of Mr. Owens.  The Government will concede that that would be a search.  Opening that car

---

[2] "To challenge a vehicle search under the Fourth Amendment, a defendant must show that he has a legitimate expectation of privacy in the area searched." *United States v. Moss*, 2016 WL 3963083, at *3 (S.D. Ga. July 21, 2016) (citing *Rawlings v. Kentucky*, 448 U.S. 98, 104-05 (1980) and *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). This was not Owens' car.  *See* doc. 37-2 at 2 (indicating that "Jiavani Smith" owned the vehicle).  If he did not rightfully possess the car, Owens cannot "have a legitimate expectation of privacy."  *Moss*, 2016 WL 3963083, at *3.  However, because the Government concedes that opening the car door was a warrantless search, it waives the issue of Owens' standing to assert his Fourth Amendment rights.  Absent evidence or argument to the contrary, the Court assumes Owens had lawful possession of the vehicle.

door, that would be a search." *See generally* doc. 37 (Minute Entry).  It is perplexing that the Government would insist that a warrantless search occurred but deny that Owens was subject to a *Terry* stop when *Terry* stops are generally considered "a far more minimal intrusion" on Fourth Amendment rights.  *See Illinois v. Wardlow*, 528 U.S. 119, 126 (2000). But in light of the Government's unequivocal concession, the Court will proceed assuming, without deciding, that opening the car door was a warrantless search.

Reasonableness is the ultimate touchstone of the Fourth Amendment, and "[i]n the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Riley v. California*, 573 U.S. 373, 381-82 (2014).  The Government bears the burden of establishing that that an exception to the Fourth Amendment's warrant requirement applies.  *See United States v. Bachner*, 706 F.2d 1121, 1126 (11th Cir. 1983).

The Government urges the Court to adopt an exception to the warrant requirement not recognized by the Eleventh Circuit: the "Community Care Doctrine."  *See* doc. 25 at 7-9; *see also United States v. McGough*, 412 F.3d 1232, 1233 (11th Cir. 2005) (assuming only *arguendo*

10

that there is a community caretaking exception to the Fourth Amendment); *United States v. Garcia*, 853 F. Supp. 2d 1177, 1198 n.13 (M.D. Fla. 2011) (electing to analyze warrantless entry into a residence under the emergency aid exception instead of acknowledging and proceeding under a "community caretaking" exception to the Fourth Amendment).  This "exception," recognized by a handful of other circuits, is born out of *Cady v. Dombrowski*, 413 U.S. 433 (1973).  *See e.g., Sutterfield v. City of Milwaukee*, 751 F.3d 542, 553-56 (7th Cir. 2014) (recounting the evolution of *Cady* into the "community care taking doctrine" and describing the doctrine's reach in various circuits).

In *Cady*, the Supreme Court held that a warrantless inventory search of a vehicle lawfully in police custody was not inherently unreasonable under the Fourth Amendment.  413 U.S. at 446-48.  There, police officers had taken a vehicle disabled in an accident into their custody.  *Id.* at 443.  The Court acknowledged that:

> [b]ecause of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. . . . Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in

> what, for want of a better term, may be described as
> community caretaking functions, totally divorced from the
> detection, investigation, or acquisition of evidence relating to
> the violation of a criminal statute.

*Id.* at 441.  Officers reasonably believed there was a gun in the vehicle and searched the car "to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands," as the car was being stored in an unattended lot seven miles away from the police station.  *Id.* at 443, 448.  The Court concluded that "the type of caretaking 'search' conducted here of a vehicle that was neither in the custody nor on the premises of its owner, and that had been placed where it was by virtue of lawful police action, was not unreasonable solely because a warrant had not been obtained."  *Id.* at 447-48.

The Eleventh Circuit understands *Cady* to apply in circumstances "when the police, in the exercise of their community caretaking functions . . . acquire temporary custody of a privately-owned automobile" and conduct an inventory search "'pursuant to standard police procedures' and for the purpose of 'securing or protecting the car and its contents.'" *United States v. Staller*, 616 F.2d 1284, 1289 (5th Cir. 1980) (internal

citations omitted).[3]   Other circuits, like the Tenth Circuit, have grown *Cady*'s acknowledgement that police officers often engage in "community caretaking functions, totally divorced from" criminal investigations, *Cady*, 413 U.S. at 441, into a freestanding exception to the Fourth Amendment.

The Tenth Circuit's version of the Community Care Doctrine allows law enforcement officers to "effect a brief non-investigatory detention in the exercise of their community caretaking functions, regardless of suspected criminal activity, when articulable facts indicate the need 'to assure the safety of the public and/or the individual.'" *Novinsky v. City of Aurora*, 491 F.3d 1244, 1253 (10th Cir. 2007) (quoting *United States v. King*, 990 F.2d 1522, 1560 (10th Cir. 1993)).  For the exception to apply,

> [the] community caretaking detention must be based upon "'specific and articulable facts which . . . reasonably warrant an intrusion' into the individual's liberty." . . . Additionally, the government's interest must outweigh the individual's interest in being free from arbitrary governmental interference. . . . Finally, the detention must last no longer than is necessary to effectuate its purpose, and its scope must be carefully tailored to its underlying justification. . . . Once the officer has completed the inquiry necessary to satisfy the purpose of the initial detention, he or she must allow the

---

[3]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

person to proceed unless the officer has a reasonable suspicion of criminal conduct.

*United States v. Garner*, 416 F.3d 1208, 1213 (10th Cir. 2005) (internal citations omitted).  The Government urges the Court to adopt the Tenth Circuit's version of the Community Care Doctrine and apply the standard used to justify detentions to the search the Government admits occurred here.[4]  *See* doc. 25 at 7-9.  It argues that because officers found Owens unconscious, initially had trouble waking him, and saw that he was visibly disoriented when he did wake up, Owens' "well-being was objectively in doubt and a welfare check was warranted."  *Id.* at 9.

As an initial matter, it is inappropriate to apply the standard for evaluating a stop to a search.  Stops and searches are fundamentally different.  A stop is a "minimal intrusion" which allows an officer to detain an individual "to briefly investigate further."  *Wardlow*, 528 U.S. at 126.  "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed."  *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).  The government must make a significantly

---

[4] The Government cites *United States v. Gilmore*, 776 F.3d 765, 768-69 (10th Cir. 2015) for the proposition that this doctrine applies to searches as well as detentions.  *See* doc. 25 at 7.  However, *Gilmore* concerns a search incident to officers taking an intoxicated person into protective custody, not a full search separate and apart from a detention, as is the case here.  *Gilmore*, 776 F.3d at 767.

stronger showing to support a search than to support a stop.  *Compare* U.S. Const. amend. IV ("[N]o Warrants shall issue, but upon probable cause. . .") *and Riley*, 573 U.S. at 382 (holding that a warrantless search must fall within a *specific*, recognized exception to the warrant requirement to be justified) *with Terry v. Ohio*, 392 U.S. 1 (1968) (holding that officers have must have reasonable suspicion, based on specific articulable facts, that illegal activity has or is about to occur to justify a stop); *see also Wardlow*, 528 U.S. 119, 120 (noting that "'reasonable suspicion' is a less demanding standard than 'probable cause'").  The Court will not confuse these distinct intrusions.

Furthermore, the Supreme Court recently cast doubt on whether *Cady* should be read broadly to justify searches in situations other than when an automobile is lawfully in police custody.  *See Caniglia v. Strom*, 593 U.S. 194, 196 (2021) (holding that "*Cady*'s acknowledgement of [police] 'caretaking' duties" does not "create[] a standalone doctrine that justifies warrantless searches and seizures in the home")[5]; *cf. Young v. Hauri*, 859 F. App'x 87, 88 n.1 (9th Cir. 2021) (citing *Caniglia* for the

---

[5]   All of the Tenth Circuit cases the Government relies on in its brief pre-date *Caniglia*.  *See generally* doc. 25 at 7-9.  The Government did not address *Caniglia* in its brief or during its argument at the suppression hearing.

proposition "that *Cady* should not be read expansively"). Though *Caniglia* focused on the First Circuit's version of the Community Care Doctrine as applied to warrantless entry into homes rather than vehicles, the Supreme Court discussed *Cady* as limited in its reach. For example, the Court observed that the search in *Cady* was of an *impounded* vehicle specifically. *Caniglia*, 593 U.S. at 199; *Cady*, 413 U.S. at 439. The *Caniglia* Court also noted that the *Cady* Court expressly differentiated between a search of "a vehicle already under police control [and] a search of a car 'parked adjacent to the dwelling place of the owner.'" *Caniglia*, 593 U.S. at 199 (citing *Cady*, 413 U.S. at 446-48).

As for the phrase "community caretaking," which the First Circuit used to justify searches of property other than impounded vehicles in police custody, the *Caniglia* Court found that:

> [t]his quote comes from a portion of the opinion explaining that the "frequency with which . . . vehicle[s] can become disabled or involved in . . . accident[s] on public highways" often requires police to perform noncriminal "community caretaking functions," such as providing aid to motorists. . . . But this recognition that police officers perform many civic tasks in modern society was just that–recognition that these

> tasks exist, and not an open-ended license to perform them anywhere.

*Caniglia*, 593 U.S. at 199 (internal citations omitted).  The Supreme Court did not expand, or endorse a broad interpretation of, *Cady*.  *See generally id.* at 196-199.  Nor did it speak favorably of the First Circuit's "'community caretaking' rule."  *See id.* at 198-99 ("The First Circuit's 'community caretaking rule . . . goes beyond anything this Court has recognized.").  Justice Alito explicitly rejected the notion of an independent "Community Care Doctrine" in his concurrence:

> The Court holds–and I entirely agree–that there is no special Fourth Amendment rule for a broad category of cases involving "community caretaking."  As I understand the term, it describes the many police tasks that go beyond criminal law enforcement. . . . The Court's decision in *Cady v. Dombrowski* . . . did not recognize any such "freestanding" Fourth Amendment category.  The opinion merely used the phrase 'community caretaking' in passing.

*Id.* at 200 (Alito, J., concurring) (internal citations omitted).

While there may be cases where "the public interest require[s] some flexibility in the application of the general rule that a valid warrant is a prerequisite for a search," the exceptions to that rule are "'jealously and carefully drawn.'" *Arkansas v. Sanders*, 442 U.S. 753, 759 (1979) (quoting *Jones v. United States*, 357 U.S. 493, 499 (1958) (abrogated on other

grounds by *California v. Acevedo*, 500 U.S. 565 (1991)); *see also Camara v. S.F. Mun. Ct.*, 387 U.S. 523, 528-29 (1967) ("[E]xcept in *certain carefully defined classes of cases*, a search of private property without proper consent is 'unreasonable' unless it has been fully authorized by a valid search warrant." (emphasis added)).  In light the Supreme Court's clear skepticism that *Cady* created a freestanding "community caretaking" exception to the Fourth Amendment applicable beyond the specific facts of that case, the Court should decline to adopt the Tenth Circuit's expansive "Community Care Doctrine" and apply it here. *Caniglia* strongly suggests that the best interpretation of *Cady* is a limited one.  *Cf. Young*, 859 F. App'x at 88 n.1 (citing *Caniglia* for the proposition "that *Cady* should not be read expansively").  The Eleventh Circuit's interpretation of *Cady*, which only goes so far as to allow inventory searches of vehicles "'pursuant to standard police procedures' and for the purpose of 'securing or protecting the car and its contents'" when officers lawfully acquire custody of a vehicle "in the exercise of their community caretaking functions," seems most appropriate.  *Staller*, 616 F.2d at 1289.  Since officers did not have custody of Owens' vehicle and

did not conduct an inventory search, *Cady* is not applicable to the present case.

However, the Government's underlying argument–that the police were concerned that Owens was suffering a medical emergency and acted reasonably to ensure his health and safety under the circumstances–is well taken. *See* doc. 25 at 9. At its core, that argument is one about the "need to assist persons who are seriously injured or threatened with injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). It is well established under the exigent circumstances exception to the Fourth Amendment that police officers may enter private property to render emergency assistance to an injured occupant without a warrant. *Id.* Justice Kavanaugh charitably suggests that some courts, in using a "'community caretaking' doctrine to allow warrantless entries into the home for non-investigatory purposes," were simply applying the exigent circumstances doctrine under another name. *Caniglia*, 593 U.S. at 205 (Kavanaugh, J., concurring). Because the Government's core assertion is that opening the car door was necessary to ensure Owens' well-being, its attempt to proceed under a "Community Care Doctrine" is "more labeling than substance." *Id.* The Court will therefore construe Government's

substantive argument to be that Officer Lambert's actions were justified under the "'emergency-aid' aspect of the exigent-circumstances doctrine." *United States v. Cooks*, 920 F.3d 735, 741 (11th Cir. 2019).

To justify a warrantless search under the emergency aid aspect of the exigent circumstances doctrine, the Government must first demonstrate probable cause for the search by showing that officers reasonably believed a person was in immediate danger. *Cooks*, 920 F.3d at 742 (citing *United States v. Holloway*, 290 F.3d 1331, 1338 (11th Cir. 2002)). This is an objective standard. *See Brigham*, 547 U.S. at 404 ("An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'" (alteration in original) (internal citation omitted)). At the suppression hearing, Lambert testified that he was familiar with the neighborhood and that it was a high crime area. In his official capacity as a police officer, he had responded to multiple shootings, seen multiple deaths, and observed multiple drug-exchanges in that neighborhood. Lambert also testified that when he looked into the vehicle, he could not see Owens' chest moving, which led him to believe that Owens might be suffering a medical crisis. After Lambert

managed to wake Owens with his second knock, Owens was visibly disoriented and appeared to be sweating.  Owens did not respond to Lambert asking him if he was "good" while holding out a thumbs up. Owens repeatedly hit the lock button, but did not exit the vehicle.

The Government argued at the suppression hearing that it was reasonable for Lambert to believe that a person found unconscious, in a neighborhood where violence and drug-related activity are common, who initially appears to not be breathing, does not respond to the first attempt to wake him, does not respond to inquiries about his well-being when eventually roused, seems disoriented, is visibly sweating, and struggles with something as simple as door locks may "be suffering some sort of emergency situation."  *See* doc. 37 (Minute Entry).  The Court agrees; it would not be objectively unreasonable for an officer to believe that Owens "may have been in need of immediate aid" under the circumstances. *United States v. Timman*, 741 F.3d 1170, 1177 (11th Cir. 2013).

The Government must also demonstrate that the search was "'strictly circumscribed' by the nature of the exigency that authorized it." *Montanez v. Carvajal*, 889 F.3d 1202, 1209 n.4 (11th Cir. 2018) (quoting *Mincy v. Arizona*, 437 U.S. 385, 383 (1978)).  Owens and the Government

agree that the "search" was the mere act of opening the car door. *See* doc. 18 at 3.  As an initial matter, vehicles do not receive the same level of constitutional protection as homes. *See generally Cady*, 413 U.S. at 439-40 (outlining the history of treating vehicles differently than homes for Fourth Amendment purposes).  Opening the vehicle door was a very limited intrusion–and one that did not exceed the nature of the exigency. Lambert reasonably believed that Owens might be suffering some sort of medical emergency.  Owens did not respond to Lambert asking whether Owens was "good" and appeared to be struggling with the door locks. Lambert opened the car door to communicate with Owens and determine if he was suffering a medical emergency and needed immediate aid. Lambert's minimal intrusion was "strictly circumscribed" by the (reasonably believed) need to offer Owens immediate aid. *See Montanez*, 889 F.3d at 1209 n.4.

Because Lambert reasonably believed that Owens needed immediate aid and opened the vehicle door to assist him, the Government has demonstrated both exigency and probable cause. *See Holloway*, 290 F.3d at 1337-38.  Under the circumstances, and especially considering the lowered expectation of privacy in vehicles compared to the home, the

Court should find that the warrantless search that occurred when Lambert opened the car door was justified under the emergency aid application of the exigent circumstances doctrine. *See Cookes*, 920 F.2d at 741-42. To the extent he argues that the firearm should be suppressed because it was seized pursuant to a warrantless search, Owens' Motion to Suppress should be **DENIED**. Doc. 18, in part.

## III. CONCLUSION

The Court **RECOMMENDS** that Owens' Motion to Suppress be **DENIED**. Doc. 18. The circumstances surrounding Owens' encounter with the police support finding that there was not a *Terry* stop and that opening Owens' door was justified under the emergency aid application of the exigent circumstances doctrine.

This report and recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3. Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Report and Recommendations." Any request for additional time

to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge. The district judge will review the magistrate judge's findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to timely file objections will result in the waiver of rights on appeal. 11th Cir. R. 3-1; *see Symonette v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO REPORTED AND RECOMMENDED**, this 20th day of March, 2024.

CHRISTOPHER L. RAY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA